IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JUDITH D. FRALEY,

        Plaintiff,

v.                                Civil Action No. 5:07-CV-141

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    Background

Plaintiff, Judith D. Fraley, (Claimant), filed a Complaint on November 1, 2007, seeking

Judicial review pursuant to 42 U.S.C. § 1383(c)(3) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on January

16, 2008.[2]  Claimant filed her Motion for Summary Judgment and Brief in Support of Motion for

Summary Judgment on February 14, 2008.[3]  Commissioner filed his Motion for Summary

Judgment and Brief in Support of Motion for Judgment on the Pleadings on March 14, 2008.[4]

Claimant filed her Response to Defendant's Motion for Summary Judgment on April 10, 2008.[5]

---

[1] Docket No. 1.

[2] Docket No. 9.

[3] Docket No. 12.

[4] Docket No. 13.

[5] Docket No.14.

B.     The Pleadings

    1.     Plaintiff's Brief in Support of Motion for Summary Judgment.

    2.     Defendant's Brief in Support of Motion for Summary Judgment.

    3.     Claimant's Response to Defendant's Motion for Summary Judgment.

C.     Recommendation

I recommend that:

    1.     Claimant's Motion for Summary Judgment be **GRANTED** for the following reasons: 1)  The ALJ did not adequately analyze Listing 2.07 and his explanation did not satisfy the Fourth Circuit requirements as laid out in Warner; 2) The ALJ failed to consider all of Claimant's severe impairments; 3) The ALJ improperly rejected the medical opinions of Drs. Arja and Janicki; 4)  The ALJ failed to include all of Claimant's limitations in the RFC finding; and 5) The ALJ improperly evaluated Claimant's credibility under Craig.

    2.     Commissioner's Motion for Summary Judgment be **DENIED** for the same reasons set forth above.

## II.  Facts

A.     Procedural History

 Claimant filed a prior application for Supplemental Security Income ("SSI") benefits which was denied by an Administrative Law Judge ("ALJ") on September 19, 2003.  (Tr. 33). Claimant appealed that decision to the Appeals Council.  The Appeals Council denied the request for review on June 22, 2004.  (Tr. 47).  On June 30, 2004, the Claimant filed a subsequent SSI application alleging the onset date of disability to be September 19, 2003 due to

arthritis, back and leg pain, hearing loss in her left ear, depression, anxiety, and posttraumatic stress disorder ("PTSD"). (Tr. 68-74, 80-81). A hearing was held on May 10, 2006 at which the Claimant and a vocational expert testified. (Tr. 377-409). The ALJ denied the claim by written decision on July 3, 2006, finding that the Claimant could perform a light range of work and , therefore, was not disabled within the meaning of the Act. (Tr. 16-25). The Appeals Council, after considering Claimant's objections to the ALJ's decision, found no basis on which to amend the ALJ's decision and denied her request for review. (Tr. 6-8). Having exhausted her administrative remedies, Claimant filed this action, which proceeded as set forth above.

B.      Personal History

        Claimant was forty-two years old on the alleged onset date of September 19, 2003. Her date of birth is February 2, 1961. (Tr. 68). Claimant was therefore a "younger individual 18-44" within the meaning of the regulations prior to February 2, 2006. From that date, she has been a "younger individual 45-49" within the meaning of the regulations. 20 C.F.R. § 416.968. Claimant received her GED and completed a six month course at a business college (Tr. 86, 382-83). Claimant has prior work experience as a cashier, a receptionist a cleaning service worker and a telemarketer. (Tr. 81, 124).

C.      Medical History

        The following medical history is relevant to the issue of whether the ALJ erred in concluding that Claimant did not meet or equal a listing in 20 C.F.R., Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 416.920(d) and 416.926.

**The Appalachian Community Health Center, Wally Dickerson, M.D., Psychiatric Evaluation, 9/7/95, (Tr. 152)**
Past Psychiatric History:
No formal psychiatric intervention. Never been on any psychiatric medication.

Impression:
Seems to have a significant amount of dysphoria characterized as major depression with mild to moderate features in the setting of a pending divorce. Cluster C passive-dependent personality. Significant problems with co-dependency, low self-esteem which are generating a fair amount of distress. Referral to psychotherapy along with medication trial would be most appropriate at this time.

Diagnosis:

| | | |
|---|---|---|
| Axis I. | 1. | Major Depressive Disorder with mild to moderate features. |
| | 2. | Rule out Dysthymia. |
| | 3. | Rule Out Co-existing Anxiety Disorder NOS. |
| | 4. | Rule Out History of Panic Disorder. |
| Axis II. | 1. | Cluster C Personality Traits. |
| | 2. | Rule Out Full Dependent Personality Disorder. |
| Axis III. | 1. | Questionable Heart Arrhythmias. |
| | 2. | Status Post Gallbladder Surgery. |
| | 3. | Status Post Tubal Ligation. |
| | 4. | Status Post Spontaneous Vaginal Delivery x2. |
| Axis IV. | | Problems with primary support group, problems with social environment, occupational problem. |
| Axis V. | | Current GAF is 40 to 50. |

**Fairmont E.N.T. Associates, 7/26/99-4/3/00, (Tr. 156)**

7/26/1999:

Examination:  tympanic membrane normal, canal clear with no lesion, normal nasopharynx and larynx, no neck masses, no carotid bruit, audiogram shows assymetric hearing loss, much worse in left ear, mild sensorineural hearing loss for right ear and severe sensorineural hearing loss for left ear, speech discrimination score of 100% obtained for right ear and 68% for the left ear

Impression:  assymetric hearing loss

Plan:  if metabolic causes are ruled out, recommend referral for Voc rehab for hearing aid

11/15/1999:

Patient counseled on proper use and care of the hearing aid as well as aid expectations. She stated she seemed to hear well and clearly and appeared pleased.

**Valley HealthCare System, 5/4/00-7/5/00, (Tr. 161)**

Patient diagnosed with major depression, recurrent.

**Jennifer Robinson, M.A., Consultative Psychological Evaluation, 8/28/2000, (Tr. 168)**

Intellectual Assessment:

WAIS-III

| | | |
|---|---|---|
| | Verbal IQ: | 84 |
| | Performance IQ: | 80 |

|                              |     |       |
|------------------------------|-----|-------|
| Full Scale IQ:               |     | 80    |
| Verbal Comprehension Index:  |     | 82    |
| Perceptual Organization Index: |   | 78    |

Verbal Subtests

| Vocabulary    | 7 |
|---------------|---|
| Similarities  | 7 |
| Arithmetic    | 7 |
| Digit Span    | 9 |
| Information   | 6 |
| Comprehension | 8 |

Performance Subtests

| Picture Completion     | 5 |
|------------------------|---|
| Digital Symbol-Coding  | 7 |
| Block Design           | 9 |
| Matrix Reasoning       | 5 |
| Picture Arrangement    | 9 |

WRAT-III

| Subject    | Standard Score | Grade Level |
|------------|----------------|-------------|
| Reading    | 90             | HS          |
| Spelling   | 90             | HS          |
| Arithmetic | 80             | 6           |

Diagnostic Impressions:

| Axis I.   | 296.31          | Major depressive disorder, recurrent, mild. |
|-----------|-----------------|---------------------------------------------|
|           | 309.81          | Posttraumatic stress disorder, chronic      |
| Axis II.  | V71.09          | No diagnosis                                |
| Axis III. | By Self Report: | Deaf in left ear, hearing loss in right ear |

**West Virginia University Physician's Office Center, 3/28/01-5/21/01 (Tr. 174)**

Report Date:   5/21/01

Referral Reason:

Patient has developed spontaneous spells of true vertigo with a spinning sensation that is disabling. Patient has a documented [sensorineural hearing loss] bilaterally, worse in the left ear. Patient has some intermittent bilateral otalgia when ascending/descending in altitude.

Results:

Saccadic latencies, accuracies and velocities were [within normal limits]. No saccadic pursuit was noted on the horizontal tracking subtest; [within normal limits]. Optokinetic

for 20 and 40 degrees/sec were symmetrical; [within normal limits]. No gaze, spontaneous or positional nystagmus was observed. Dix Hallpike was negative for both head hanging positions. Caloric results did not yield any clinically significant unilateral weakness or directional preponderance.

Outpatient Progress Note:     4/30/01
Objective:

The physical exam shows the patient to be in no acute distress. Respirations quite and nonlabored. She ambulates somewhat deliberately, but without difficulty or staggering. She does, in fact, tumble with Tandem gait attempts. She is somewhat wobbly on Romberg testing. Her head is normocephalic and atraumatic. Ear exam shows clear and mobile tympanic membranes bilaterally without effusion or infection. The nasal mucosa is clear and healthy without mass or lesion. No pus or polyps noted. Septum is intact without perforation. Her oral cavity shows an intact palate and normal mucosa throughout. There is no evidence of oropharyngeal infection or lesion. The nasopharynx shows no mass or lesion and healthy tissue throughout. The eustachian orifices are clear of lesion. The supraglottic larynx is normal. Vocal folds are mobile to mirror exam. Neck has no adenopathy or mass. Eyes are without nystagmus spontaneously or induced.

Tests and X-Rays:

Audiogram compared to one ordered by Dr. Daristotle on 7/26/1999 and shows similar pure tone thresholds with mild to slight sensorineural hearing loss AD, and moderate to severe sensorineural hearing loss AS. The discrimination score is 100% on the right, and 44% on the left.

Assessment:

Assymetric sensorineural hearing loss and dizziness of unknown etiology.

Radiology Report:     5/21/2001
Findings:

No prior imaging study available for comparison. There is homogeneously enhancing mass lesion in the left cerebellopontine angle with possible extension in to the left internal auditory canal measuring 1.6 mm in AP dimension, 1.0 cm in transverse dimension, and 1.5 cm in craniocaudal dimension, which has s signal characteristic and enhancement of an acoustic neuroma. There is a focal area of high-signal intensity on the T2-weighted images in the deep ventricular white matter, which is just posterolateral to the posterior horn of the left lateral ventricle. Another focal area of high-signal intensity on T2-weighted images in the posterior aspect of the right frontal love is present. Mucous membrane thickening of the left maxillary sinus is present.

Impression:

1.     Probably acaustic schwannoma of the left cerebellopontine angle with
       measurement as above.
2.     Two focal, nonspecific areas of high-signal intensity; one in the posterolateral

aspect of the posterior horn of the left lateral ventricle and the second one in the posterior aspect of the right frontal lobe.

**West Virginia University Hospitals, Department of Otolaryngology, 6/26/01-6/30/01 (Tr. 194)**

Reason for Hospitalization:

Patient is a 48-year old white female with a history of a left acoustic neuroma.

Major Procedures:

Translabyrinthine approach for removal of a left acoustic neuroma done in combination with neurosurgery.

Hospital Course:

Patient was admitted and underwent the above procedure and tolerated it well. She was in the surgical intensive care unit on the first postoperative day. She was transferred to a step-down floor. During her convalescence, she had diplopia in the extreme right visual gaze as well as some right eye pain and slight diplopia on extreme right gaze.

**Fairmont Rehabilitation Center, 11/12/01-12/13/01, (Tr. 208)**

Patient referred for ataxia following acoustic neuroma surgery and given a home exercise program

**Diego Ponieman, M.D., 7/11/02, (Tr. 225)**

Chief Complaint:

Poor balance status post brain tumor

Assessment:

Patient states that she has not felt better since her surgery for acoustic neuroma removal. Patient says she looses [*sic*] balance very often and as the day goes along she starts feeling dizziness. She says that when she becomes tired the dizziness is worse. The patient states that she cannot drive and she has problems communicating with people secondary to her lack of hearing on the left ear status post surgery. At home she states that she can do some work but it takes her a long time. Before the tumor was diagnosed she used to work as a receptionist at a locel hotel and since then she has been unable to work. Also the patient states that she suffers from low back pain and it is usually worse in the morning. The patient states that there is [*sic*] some nights where she has to crawl to the bathroom secondary to pain. The patient can walk across the examining room.

Impression:

1.   Status post acoustic neuroma resection.
2.   Total hearing loss on the left ear.
3.   Unsteadiness with walking.
4.   Vertiginous sensations.
5.   Chronic low back pain.

6.     Chronic low back strain.

**James E. Bland, M.D., Audiological Report and Otological Examination Report 10/25/02-11/20/02, (Tr. 229)**

10/25/02:

Right ear shows mild-moderate-severe sensorineural hearing loss and 96% speech discrimination.  The left ear shows profound sensorineural hearing loss with no speech discrimination present.

11/13/02:

Procedure:

Bithermal caloric test, tracking test, saccade test, gaze test, positional test, optokinetic test, and Hallpike maneuver.

Results:

Caloric irrigations of the left ear were significantly weaker than those of the right during both cool and warm irrigations.  There were no other abnormalities.  Pursuit gains were normal.  Optokinetic nystagmus was normal and approximately equal bilaterally.  There was no significant spontaneous or positional nystagmus, either with eyes open or closed.  Saccade peak latencies, accuracies and velocities were within normal limits.  The Hallpike maneuver provoked no nystagmus, either with right ear undermost or with left ear undermost.  The patient had difficulty following directions for gaze testing.

Impression:

Results indicate a chronic or compensated vestibular pathology on the left side.

11/20/02:

Diagnosis: Profound [hearing] loss in the left ear.  There is a flat moderate loss in the right ear.  Wide-based and staggering spontaneous nystagmus.

**Mohamad Arja, MD, 5/16/02-12/3/02, (Tr. 236)**

12/3/02:

New Problems: Woozy feeling, weakness in right arm at times, dropping things, balance off at times, has fallen a few times.

Impression:  Right carpal tunnel syndrome suspected, vertigo

9/19/02 - Routine Physical Abstract Form:

Diagnoses:
1.     Acoustic neuroma
2.     Gastroesophageal Reflux Disease
3.     Depression
4.     Generalized Anxiety Disorder

5.      Hip and back pain
6.      Neck pain
7.      Hearing loss
8.      Vertigo

Medical Source Statement: I feel Mrs. Fraley is not able to function successfully in any work environment due to her balance problems, her hearing loss and difficulty handling stressful situations.

## Morgan Morgan, M.A., Consultative Psychological Evaluation, 8/20/04, (Tr. 251)
Diagnostic Impression:

Axis I.      (296.89) Bipolar II Disorder, hypomanic, with rapid cycling.
             (309.81) Posttraumatic Stress Disorder, chronic
Axis II.     (V71.09) No diagnosis
Axis III.    Reported back pain, hearing problems, history of brain tumor, and allergies

## Bennett Orvik, M.D., Consultative Psychological Evaluation, 8/25/04, (Tr. 257)
Diagnosis and Impression:

1.      Chronic low back pain, etiology unclear.
2.      Deafness of left ear secondary to precious acoustic neuroma.
3.      Depression.
4.      Possible posttraumatic stress disorder.
5.      Exogenous obesity.

## Stonewall Jackson Memorial Hospital, Diagnostic imaging, 8/24/04, (Tr. 265)
Lumbar Spine:

AP, and lateral view of the lumbosacral spine are obtained.  The vertebral body height is maintained.  There is narrowing of the intervertebral disk [*sic*] space at the level of L5-S1.  There is no evidence of spondylolisthesis.  No blastic or lytic lesions are noted.

**Impression** - Degenerative discogenic disease at the level of L5-S1

## Maurice Proust, PhD, Psychiatric Review Technique Form & Mental RFC, 9/20/04, (Tr. 267)
Psychiatric Review Technique:
Medical Disposition is Based Upon:

12.04 Affective Disorders and 12.06 Anxiety-Related Disorders

12.04 Affective Disorders:

Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)

12.06 Anxiety-Related Disorders:
    Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress

Rating of Functional Limitations:
    1.    Restriction of Activities of Daily Living - Moderate
    2.    Difficulties in Maintaining Social Functioning - Moderate
    3.    Difficulties in Maintaining Concentration, Persistence, or Pace - Moderate
    4.    Episodes of Decompensation, Each of Extended Duration - None

Consultant's Notes:
    Goes to computer class 2x/week, cooks, does laundry, drives, does crafts and reads. Says she doesn't go out to eat due to paranoid ideation toward other people.

Mental Residual Functional Capacity Assessment:
    Patient is capable of understanding simple directions but complex instructions may be a problem.  She is capable of doing a remedial [*sic*] work day/week provided she has limited contact with the general public, peers and co-workers.

**Frank D. Roman, Ed.D, Psychiatric Review Technique Form & Mental RFC, 2/16/05, (Tr. 288)**

Psychiatric Review Technique:
Medical Disposition is Based Upon:
    12.04 Affective Disorders and 12.06 Anxiety-Related Disorders

12.04 Affective Disorders:
    A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria listed.

12.06 Anxiety-Related Disorders:
    Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress

Rating of Functional Limitations:
    1.    Restriction of Activities of Daily Living - Mild
    2.    Difficulties in Maintaining Social Functioning - Moderate
    3.    Difficulties in Maintaining Concentration, Persistence, or Pace - Moderate
    4.    Episodes of Decompensation, Each of Extended Duration - None

"C" Criteria of the Listings:
    No evidence to establish the presence of the "C" criterion

Mental Residual Functional Capacity Assessment:
    Does not meet or equal a listing

**Thomas Lauderman, D.O. & Cynthia Osbourne, D.O., Physical RFC, 9/21/04 & 2/17/05, (Tr. 307)**

Exertional Limitations:
1. Occasionally lift and/or carry up to 20 pounds
2. Frequently lift and/or carry up to 10 pounds
3. Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday
4. Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
5. Push and/or pull - unlimited

Postural Limitations:
Climbing - ramp/stairs-ladder/rope/scaffolds: Never due to dizziness

Environmental Limitations:
Avoid all exposure to hazards such as machinery, heights, etc. due to dizziness

**University Health Associates, Stephen Wetmore, MD, History and Physical, (Tr. 320)**

Assessment:
1. History of left acoustic neuroma status post translabyrinthine resection, currently with radiologic abnormality of uncertain significance.
2. Dysequilibrium, stable.

Plan:
Outside MRI from St. Joe's dated 7/23/05 reviewed. No evidence of recurrence of acoustic neuroma.

**Tri-County Health Clinic, 3/17/05-11/10/05, (Tr. 322)**

Patient seen for both physical and psychiatric care.

**St. Joseph's Hospital of Buckhannon, Emergency Room, 7/23/05 (Tr. 348)**

MRI Orbit Face & Neck w/& w/o Contra:
There is a 1 cm enhancing mass in the left CP angle. This could represent recurrence of acoustic neuroma. Postop changes are seen in the left mastoid. Right CP angle appears normal. No other posterior fossa signal abnormality is identified.

MRI Brain Unenhanced/Enhanced:
Ventricular system is normal. There is no mass effect or evidence of intracranial hemorrhage. Subarachnoid spaces appear clear. No acute signal abnormalities are identified. Enhancement pattern appears normal. Diffusion sequence appears unremarkable.

**The Appalachian Community Health Center, 3/31/06-4/21/06, (Tr. 358)**

Assessment:
Recurrent major Depression 296.33

Diagnostic Impression:

| | |
|---|---|
| Axis I (Primary). | 296.33 Major Depressive Disorder, Recurrent Severe, Without Psychotic Features |
| Axis II (Secondary). | 309.81 Post Traumatic Stress Disorder |
| Axis II. | V71.09 No Diagnosis |
| Axis III. | Z03.2 No Diagnosis |
| Axis IV. | 1 - History of Abuse |
| Axis V. | GAF 50 |

**Appalachian Community Health Center, Psychiatric Examination, 7/13/06, (Tr. 369)**

Assessment:

| | |
|---|---|
| Axis I. | 309.81 Post Traumatic Stress Disorder |
| Axis II. | V71.09 No Diagnosis |
| Axis III. | GERD; Neurodermatitis |
| Axis IV. | Early childhood abuse with unfortunate relationship problems as an adult secondary to that now with poverty and with limited ability to relate to other humans |
| Axis V. | GAF 45 |

**Appalachian Community Health Center, Treatment Notes, 5/22/06-9/15/06, (Tr. 374)**

Assessment:

Recurrent major Depression 296.33

D.    Testimonial Evidence

Testimony was taken at a hearing held on May 10, 2006.  The following portions of the testimony are relevant to the disposition of the case:

Q    And, now you indicate you haven't been able to work since around September of '03, so we're looking back about two and a half years or so.  What's been the main problem with your ability to work since then?

A    I have a lot of problems with concentration, being able to get along with people. I'll try to concentrate on something and I can't do it.  I get aggravated.  When I get aggravated I get moody.

Q    Well - -

A    Then I can't be very nice.

12

Q        Why is this?  I mean, what's the problem with your concentration?

A        My mind races.  It's like I'm channel surfing in my head.  I think crazy thoughts.

Q        Are you getting treated for this?

A        Yes, sir.  I am.

Q        And who's treating you?

A        I'm going to Appalachian Mental Health Center right now.

                    *                *                *

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q        Is that helping?

A        The medications helping my anxiety but I still have a lot of racing thoughts.  I think a lot about my past, things that I went through in my past which I'm working on that too.

Q        Have you told the doctor or the therapist about the racing thoughts?

A        Yes, sir.  I have.

Q        What do they say?

A        They just told me to try to keep myself pre-occupied but even when I get out and walk or something like that it just constantly goes through my mind.  When I try to concentrate on something else it just comes right back.  It just starts, I start thinking crazy stuff.

Q        What do you mean crazy stuff?  I'm not sure.  Can you give like some example or?

A        Well like if my daughter's coming down anything, I'll start thinking she's going to be an accident and be killed or my ex-husband's coming to my house.  He's going to hurt me.  Just -   Q        So you start worrying?

A       Well, yeah.  I start worrying about things that shouldn't be worried about.  My other racing thoughts is like things that's happened to me in my past, like the abuse and stuff like that.  It just keeps coming back.

*                    *                    *

Q       Do you, what kind of problems do you have from irritability?

A       Well, I get nasty and snappy with people.  My neighbors and stuff tell me to get a life.  I need to, you know, quit being that way.  Quit having an attitude.  A lot of times, sir, I don't realize I have the attitude.

Q       Um-hum.

A       It just comes out.

Q       Anything makes this condition worse, cause you to feel worse?

A       Whenever I can't concentrate.  If I try to do something and I get off track with it.  I get aggravated because I can't finish it.  And when I get aggravated I get snappy.

Q       Anything make you feel better other than the medicine?  Anything help to lift your spirits or anything?

A       No, sir.  I wish there was.  That was my purpose of trying - to get help.

*                    *                    *

Q       Do you, well, so do you do the cooking and cleaning and dishes and that kind of stuff?

A       Yes.

Q       What kind of things do you cook?

A       Well, TV dinners, sandwiches, easy stuff.  Just with one person it's no sense of

making big meals and I eat when I feel like eating.

Q      Do, have you lost weight lately?

A      I went from 235 pounds to 205.

Q      Were you trying to lose weight?

A      No, sir.

Q      Do you know why you lost 30 pounds?

A      I just don't eat.

Q      And over what period of time was that, do you know?

A      Probably about a year.

Q      Do you do any like grocery shopping for yourself?

A      Yes.

Q      Can you drive okay?

A      I can drive fine.  It's just sometimes even when I'm driving, my mind will wander off and I've got to be careful.  I really don't like driving that much unless I have to because I could be going down the road and I'd be thinking of something else.

Q      Do you have any hobbies or anything you still enjoy doing when you're at home?

A      When I can concentrate on it, I like to crochet or do plastic canvas work but there you go again, I get into start doing it and then I just start, my mind starts going crazy.  I get frustrated and put it down and quit.

Q      How often can you do one of these things?

A      Not very long.

Q      How long can you stick it out before you wind up getting frustrated?

A       Probably about a half hour, because my mind starts wandering, I start making mistakes and then I get frustrated and quit.

Q       Yeah.  Do you ever get out and visit friends or relatives or anything like that?

A       I used to but not anymore.

Q       Why is that?

A       I just don't want to be around nobody.  The main reason is when I, like if I go to my sister-in-law's or something like that I feel like they don't want me there.  I feel unwelcome.

                              *                  *                  *

Q       Well how do you spend your time most days?

A       Sit and thinking.  There's times I get up - -

Q       Well you had - -

A       Huh?

Q       You had a history of a neuronal in your left ear?

A       Yes, sir.

Q       And they took that out and there's been no recurrence or anything like that, correct?

A       That's true.

Q       But you're left without any hearing in your left ear, is that correct?

A       Yes, sir.

Q       But as I understand that you can hear okay out of your right ear?

A       I'm border - - I have borderline hearing in my right ear.  If I'm in an area where there's a lot of noise, it's very hard for me to understand people talking.  I've basically learned to

read lips pretty good.  I'll stare at that person so I can understand when they're saying.

Q       Are you taking any medicine or getting any treatment for your ear conditions?

A       No, sir.  It was suggested - -

Q       How many times - -

A       - - it was suggested - -

Q       How - -

A       - - it was suggested by the Parks for Cardiology that I am qualified for a hearing aide that goes from my left ear around to my right.  It connects it, but I can't afford that.

Q       Uh-huh.  Do you have any other conditions that affect your ability to work besides the hearing and the racing thoughts?

A       I have a really bad problem with my balance since my surgery.  I stumble over myself when I'm walking at times.  I just - - my feet seem to get crossed.

Q       How long have you had this problem?

A       Since I had my surgery.

Q       And when was that?

A       2001.

Q       How do you deal with this?

A       Just deal with it, try not to pay no mind to it.  If I fall, I'll fall.

Q       How often do you fall?

A       Here lately, I've only fell one time, but I try to catch myself and I'm very careful where I walk.  I don't walk on, try not to walk on uneven places like gravel roads, stuff like that.

Q       How far can you walk on a normal flat surface?

A        A block or so.

Q        There's some kind of noise here.  Oh, okay.  I have something sitting on a computer.  And why can't you walk more than a block?

A         Because my legs get tired and my back hurts.  I have a problem with degenerative arthritis in my back and if I stand for long periods of time it starts to hurt.

Q        How long can you stand at a stretch?

A        Sir, I really couldn't tell you.  I've never timed it.  I was taking Niaspan for my legs because I was having charley horses in my legs, which Dr. Aumen is the one that prescribed that but I was having a really bad problem with the side effects to it so I quit taking it.  It was a medicine to dilate - -

Q        So what was that?

A        It was Niaspan.  It dilates the blood vessels to improve circulation in my legs.  I was having charley horses.

Q        And what side effects did you have?

A         My stomach hurt really, really bad.  I felt like I was on fire and being stung by a bunch of bees, and it scared me, so I quit taking it.

Q        And then Dr. Aumen was treating you for arthritis in the back?

A        No, sir.

Q        Well, what was he treating you for?

A        He, Dr. Aumen was basically treating me for post-traumatic stress disorder and my anxiety attacks and he's the one that - -

Q        Oh, I thought you said he prescribed this business for your charlie horses?

A        Niaspan, he did. He's the one that suggested I take Niaspan to dilate my blood vessels because he said he used it and it was good.

Q        Was that a prescription medicine or is it over the counter?

A        It was prescription.

Q        So he was treating you for this problem with your legs?

A        Yes.

Q        Okay. Now, what does this come from, do you know?

A        No, sir.

Q        And are you getting treated for arthritis in your back?

A        Not anymore. I was taking that. They took it off the market.

Q        Vioxx.

A        Vioxx, yes sir. A long time ago but I quit taking it too. Now basically if I have problems with my back it's bed rest, heat. I have a massager that I sit on that massages the muscles in my back.

Q        How long can you sit at a stretch before you'd have to get up? Any problems with sitting?

A        Well I really don't sit still long enough to find out. Like I said, I get, I don't know. I can't sit still very long because I got to get up to do something.

Q        Well, if you're able to move around in the chair, how long do you think you can sit before you'd have to get up on account of your back or your spine or your muscles?

A        About a half hour if it's on a hard surface. When I sit at home, I sit with a pillow behind my back.

Q       Do you have any problems with your hands or fingers?

A       My right hand, if like sewing or crocheting or something like that, my fingertips will go numb.

Q       Have you gotten any treatment for this problem?

A       A long time ago I went to a doctor and they gave me a wrist brace to use.  They told me I have to use it at night to sleep with it on because there was a possibility of carpal tunnel in my right hand.

Q       Did that brace help?

A       It helps and I take it off - -

Q       Do you still have it?

A       Yes, sir.  I do.

Q       And do you still use it?

A       Yes, sir, I do.

Q       What's the most you can lift now you think?  When I say lift, I don't mean bend over to the floor, but if you're sitting or standing like at a table, like the one you're at, how long, how much do you think you could pick up and move say, a refrigerator or to another table?

A       I didn't understand the question.

Q       How much do you think you can lift off of a table and say move to a refrigerator or move to another table?

A       15, 20 pounds.

Q       Do you think you can lift like a case of pop or how much do you think you can lift?

A       I can lift a case of pop but it pulls, it puts strain on my back muscles.  My grandson weighs about 35 pounds and if I tote him, it bothers my back.  That's why I make him walk.

Q       According to our records, you really haven't worked at a full time job for the last 15 years.

A       I worked to Holiday Inn before my surgery for three months.

Q       But that only, yeah, what did you do there?

A       I was a front desk receptionist.

Q       And why did you leave that job?

A       I got fired.

Q       How come?

A       Because they told me I wasn't getting it.

Q       Well - -

A       I had to run a bunch of computers and stuff like that and when the boss taught me one thing and then they tried to teach me something else, I would forget what I learned the first time.  And so, when they tried to teach me several things at one time, I couldn't remember how to do what they previously taught me.

Q       Yeah.  Did you ever drink alcohol or take illegal drugs?

A       I used to have an occasional beer, but no, sir, I've never taken drugs.

Q       Ever have a problem with drinking alcohol?

A       No, sir.

Q       In the past?

A       No, sir.

Q       There's a notation that says in approximately about 20 years ago you used alcohol heavily for several months.

A       No, sir.  I used to drink wine to help me sleep but I never, I wasn't drunk.

*                *                *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q       Ms. Fraley, can you tell me what's the main reason today that keeps you from going to work?

A       I believe it's my concentration and my anxiety.

Q       Okay.  Now at this point in time do you feel that you would deal with a supervisor telling you what to do, looking over you, that sort of thing?

A       Probably get aggravated with him, especially if I start losing concentration and he gets down on my back or something like that.  Hey, pay attention here.  I'd probably get snappy.

Q       Okay.  What about dealing with co-workers?  Would you have any problem dealing with co-workers?

A       I'm really not a people person.  I mean, if they would start like, I feel like they would get into my space or something, I'd probably say something to them.  You know, hey, back off.  Leave me alone.

Q       Okay.  Do you have any friends now other than the one fellow that you mentioned?

A       I have acquaintances but no friends, no.

Q       Is that a change for you over your life?

A       No.  I was never really a people person.

Q       Okay.  Not - -

A       I have a problem with trust.

                        *                    *                    *

Q       Has your condition changed any since your previous hearing?

A       Yes, sir.

Q       How has it changed?

A       Since my brother died, a year or so - -

Q       Now, when was that?

A       Almost two years ago, I think.

Q       Okay.

A       I've had a lot of problems with, like I said my past.  Things that's happened to me
in my past.  Me and my brothers would get together and we'd start things and bad memories
started coming into my head.  Like I told Dr. Aumen, it was like, excuse me, Judge, demons
from hell.  It's just like things had just started coming into my head that I'm trying.  I'm wanting
to forget and now they're coming back.

Q       And that's generally happened to you, I think you said, since the last hearing?

A       Yes.  It's, yeah.

                        *                    *                    *

Q       Now Social Security actually quite some time ago in 2000 had sent you to see a
psychologist and so you'd seen, her name was Jennifer Robinson.  They make - - there's some
notations in the file about having some illusions or delusions.  Do you know what that's about?

A       Yes, sir, I do.

Q       Can you tell me about that?

A       I sometimes see things that aren't there, or I will hear things that I can't figure out where the sounds coming from.  Like at that time, it was like babies crying.  I couldn't figure out, I don't - - thee's no babies here.  Now it's a doorbell ringing.  I'll swear I'll hear a doorbell ring.  I'll go and thee's no one there.  But the illusions is like little white misty things.  My daughter tells me, awe, mom it's your dog's ghost, you know.

Q       Uh-huh.

A       Stuff like that, but I do see this stuff.

Q       Okay.  And have you talked to your doctor, Dr. Aumen about that?

A       Yes, sir.  I have.

Q       Okay.  Has the medication helped with that problem at all?

A       Basically the Zoloft has helped me with my panic attacks.  I don't get rapid heart beats and stuff like that.

*               *               *

A       I try to get up, pre-occupy myself to do something else.

Q       If you were at a work, if you were at a job at work, would you be able to remain focused on whatever it was that you were doing at work?

A       Oh, no, sir.  I can't even remain focused at home at my computer.  Like I said, if I start doing something, it's just these thoughts come into my head and the thoughts override what I'm doing.

Q       Okay.   Now, have you ever had to go to the emergency room because of your

mental state?

A       I had to go to the emergency room one day because I had a severe panic attack and it scared me really bad.

*               *               *

Q       Okay.  Now, Ms. Fraley, since your last hearing, has your overall health, you know, your mental and physical condition, is it better, the same or has it gotten worse?

A       It's gotten worse, especially with the racing, the anxiety and stuff I had then, but now like I said, since my brother has died, he was really young.  I just have that he's, things from my past popping into my head and I also think well who's next, me or my two brothers.

Q       Okay.  Okay.  Is there anything here today that we haven't talked about that we need to talk about that we've forgotten?

A       Well, I don't know if I mentioned it, I don't like bridges or heights because if I get on a bridge or if I get high, it feels like they're moving.

Q       Okay.

*               *               *

Q       Oh, there is some, one other thing I want to ask you about.  Do you have difficulties with the strength in your hands?

A       Just my right hand.  Like I said if I - -

Q       Is it your right?

A       Yeah.  It's my right hand.  If I use it a lot, it goes numb, but since my surgery on my left side, I do have some weakness in my left.

Q       Okay.  You have some weakness in your left?

A    Yes.

Q    In your grip?

A    Yes.

                    *            *            *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q    Okay. Mr. Bell, let me, as I said, I don't see any past relevant work as it's legally defined. So let me give you a hypothetical question. If we assume a person of the same age, education and work experience as the Claimant. But assume the person able to do light work as that's defined in the Commissioner's regulations. But in addition, the person would have to have the ability to change positions briefly and by briefly I mean just for a minute or two, at least every half hour. Be no significant background noise and must be able to have instructions given face to face. And no ladders, ropes, scaffolds, stairs or ramps. And no more than occasional balancing. No exposure to significant work place hazards like heights or dangerous moving machinery. And there should be no work with detailed or complex instructions. No close concentration or attention to detail for extended periods. The job should not involve fast paced or assembly line work. No work with the general public. And no close interaction with the supervisors of the co-workers. Would there be any jobs such a person could do at the lighter sedentary level?

A    Yes, Your Honor. At the light level, that hypothetical individual I believe could function as a grader or sorter in the carbon industry. That's at light. 90,000 nationally. 1,200 regionally. Or as an office assistant, light. 150,000 nationally. 1,875 regionally. At the sedentary level, machine operator, sedentary. 155,000 nationally. 1,500 regionally. Or a

machine tender, sedentary.  141,000 nationally.  1,400 regionally.

Q        What's the difference between a machine tender and a machine operator?

A        A machine tender is basically you're supplying materials for the machine to
continue it's operation periodically and a machine operator is you're actually operating a
machine to complete the task.  You're, it goes at the pace that you operate it.

Q        Okay.  Is your testimony consistent with the DOT?

A        Yes, I believe it is, Your Honor.

Q        How many days if any can a person miss work and still be able to do these un-
skilled jobs?

A        If a person's going to miss more than two days per month, I believe there would
be an attempt by supervisory or personnel to have that corrected and if not corrected would result
in termination.

*                *                *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        Mr. Bell, a more general question first.  How are conflicts with supervisors
meaning conflicts with supervisors and co-workers, meaning confrontational type conflicts that
occur in the workplace, how are those tolerated by employers in these types of jobs?

A        Well they would try to intervene to make, to have that not happen.  I mean it
wouldn't be something to be tolerated.  Hopefully, the, any confrontation would be taken care of
between the two people involved but if the supervisor got involved, then they would not want
that to be repetitive.

Q        If that occurred on an on-going basis, would that affect the person's

employability?

A       Yes, I think it would.

Q       Okay.  I'm assuming that would negatively affect their employability?

A       Right.

Q       Okay.  Now, Mr. Bell, if we believe Ms. Fraley's testimony and a person were going to have to leave the work situation or be off task from their work duties to the frequency that she testified, which I, let's just say for the purpose of this hearing would be 25 percent of the time.  Would that have any effect on their employability?

A       I don't believe that would allow for a competitive work routine.

Q       What's the maximum amount of time that a person could be off task from their work duties?

A       Depending on the site, one to nine percent.  More than, ten or more is not generally acceptable.

ATTY:       Okay.  I don't think I have any other questions.  Thank you, Mr. Bell.

*               *               *


E.       Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life:

Feeds her pet fish and birds. (Tr. 114)

Prepares meals 1-2 times a day. (Tr. 115, 389)

Cleans house and does laundry. (Tr. 115)

Goes outside daily to check mail. (Tr. 116)

Drives to the store once a month to grocery shop. (Tr. 116, 389)

Pays bills. (Tr. 116)

Spends time with her daughter and son. (Tr. 117)

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, claimant alleges the following instances of error on the part of the ALJ: 1) The ALJ erred because he failed to adequately consider claimant's impairments in conjunction with Listing 2.07; 2) The ALJ erred because he failed to consider all of claimant's severe impairments; 3) The ALJ erred because he improperly rejected all medical opinions favorable to claimant; 4) The ALJ erred because he did not include all of claimant's limitations in the residual functional capacity finding; and 5) The ALJ erred because he did not properly consider claimant's credibility.

Commissioner maintains that substantial evidence supports the Commissioner's decision that claimant could perform a limited range of light work; that the ALJ properly evaluated claimant's claim at Step 3 of the sequential analysis; that the ALJ properly considered whether plaintiff's impairments were severe impairments at Step 2 of the sequential analysis; that the ALJ properly evaluated the medical source opinions in accordance with the regulations at 20 C.F.R. § 404.1520; that the ALJ properly determined claimant's residual functional capacity; and that the ALJ properly evaluated claimant's subjective complaints.

B.      The Standards.

1.      Summary Judgment.  Summary judgment is appropriate if  "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

show there is no genuine issue as to material fact and the moving party is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party

opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986).  However, "a party opposing a properly supported motion for summary judgment may

not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242,

256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive

judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir.

1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears

the burden of showing that she has a medically determinable impairment that is so severe that it

prevents her from engaging in any substantial gainful activity that exists in the national

economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S.

Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6. <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

10. <u>Social Security - Substantial Evidence - Listed Impairment</u>. In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment. <u>Cook v. Heckler</u>, 783 F.2d 1168, 1172 (4th Cir. 1986). The ALJ must identify the standard to be applied. <u>Id</u>. At 1173. The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts. <u>Id</u>.

11. <u>Social Security - Non-treating physician</u>. It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. <u>Hayes</u>, 907 F.2d at 1456. The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law is applied, not to substitute the Court's judgment for that of the Commissioner. <u>Id</u>. "[T]he ALJ must decide what weight to assign to a non-treating physician's opinion, based on several listed factors (including (i) the

existence, nature, and extent of any treatment or examining relationship; (ii) the extent to which the opinion is supported by medical evidence and is consistent with the record as a whole; and (iii) whether the opinion is rendered an area of specialty). Craft v. Apfel, 164 F.3d 624 (Table) (4th Cir. 1998).[6] "An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion. Craft, 164 F.3d 624 (Table) (4th Cir. 1998). See also 20 C.F.R. § 404.1527(d).

12. Social Security - Treating physician. An ALJ is obligated to evaluate all medical opinions and may not choose to ignore the written opinion of a treating physician. Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).

13. ALJ's Duty to Inquire Into the Evidence. "[T]he ALJ has a duty to explore all relevant facts and to inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the Claimant when that evidence is inadequate." Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981). See also Cook, 783 F.2d 1168. When failure to inquire into the additional evidence is prejudicial to the Claimant then the case should be remanded. Marsh v. Harris, 632, F.2d 296, 300 (4th Cir. 1980).

14. Social Security - Vocational Expert. Once it is established that a Claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish

---

[6] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

that a significant number of other jobs are available in the national economy which the Claimant can perform.  20 C.F.R. §§ 404.1520(f), 416.920(f).

15.     Social Security - Vocational Expert - Hypothetical.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the Claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[7], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

16.     Vocational Expert Purpose.  "The purpose of bringing in a vocation expert is to assist the ALJ in determining whether there is work available in the national economy which the particular Claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996).  "[R]equiring the testimony of a vocational expert is discretionary." Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981).

17.     Social Security - Vocational Expert - Hypothetical - Claimant's Counsel.  Based on the evaluation of the evidence, an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ.  France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

18.     Vocational Expert and the DOT.  SSR 00-4p states in part that "occupational

---

[7] See FN 6.

evidence provided by a VE or vocational specialist (VS) should be consistent with the occupational information supplied by the D.O.T.  When there is an apparent unresolved conflict between VE or VS evidence and the D.O.T., the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the Claimant is disabled."

19.    <u>DOT</u>.  "Evidence from VEs or VSs can include information not listed in the DOT. The DOT contains information about most, but not all, occupations. The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term 'occupation,' as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs.  Information about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling. The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p

20.    <u>Sedentary work</u>.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking is often necessary in carrying out job duties.  Jobs are sedentary if is walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. §§ 404.1567(a),

416.967(a).

21. <u>Light Work</u>. Light work is defined in the regulations as: "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

22. <u>Social Security - Severe Impairment</u>. An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a Claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). <u>See also</u> <u>Byrd v. Apfel</u>, No. 98-1781, slip op. at 2 (4th Cir. Dec. 31, 1998)[8]; Social Security Ruling 85-28.

23. <u>Social Security - Residual Functional Capacity</u>. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. <u>Id</u>. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. <u>Id</u>. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. <u>Id</u>. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. <u>Id</u>. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a

---

[8] See FN 6.

Clamant may be able to do despite their impairments.  Id.

24.  <u>Social Security - Listing</u>.  The ALJ must fully analyze whether a Claimant's impairment meets or equals a "Listing" where there is factual support that a listing could be met. <u>Cook</u>, 783 F.2d at 1168.  <u>Cook</u> "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases."  <u>Russell v. Chater</u>, No. 94-2371 (4th Cir. July 7, 1995) (unpublished).[9]  In determining disability, the ALJ is required to determine whether Claimant's condition is medically equal in severity to a listing.  20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3). The ALJ is required to explain his findings at each step of the evaluation process so that the reviewing court can make determinations on whether his decision is supported by substantial evidence.  <u>Gordon</u>, 725 F.2d 231.  <u>See also</u> <u>Myers v. Califano</u>, 611 F.2d 980, 983 (4th Cir. 1980).

25.  <u>Social Security - Claimant's Credibility</u>.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight."  <u>Shively v. Heckler</u>, 739 F.2d 987, 889 (4th Cir. 1984) citing <u>Tyler v. Weinberger</u>, 409 F. Supp. 776 (E.D. Va. 1976).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference.  <u>See</u> <u>Nelson v. Apfel</u>, 131 F.3d 1228, 1237 (7th Cir. 1997).  We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'"  <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000) citing <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990).

C.  <u>Discussion</u>

1.  <u>Whether the ALJ Failed to Adequately Consider Claimant's Impairments in</u>

---

[9] See FN 6

<u>Conjunction with Listing 2.07</u>

Claimant contends that the ALJ erred because he failed to adequately consider all of her impairments in conjunction with Listing 2.07.[10]  The ALJ acknowledged in his decision that the claimant's physical impairments had been considered under 2.07, but offered little explanation for why the claimant failed to meet the listing.  (Tr. 21).  Commissioner counters that the ALJ determined that the evidence did not show claimant had a very severe reduction in hearing in both ears.

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520.  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  <u>Id</u>. at § 404.1520(b).  If the claimant is not, the second inquiry is whether the claimant suffers from a severe impairment.  <u>Id</u>. at § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  <u>Id</u>. at § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  <u>Id</u>.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  <u>Id</u>. at § 404.1520(e).  By satisfying inquiry four, the claimant establishes a <u>prima facie</u> case of disability.  <u>Hall</u>, 658 F.2d at 264.  The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the

---

[10] To meet Listing 2.07, a claimant must show:
2.07 *Disturbance of labyrinthine-vestibular function (including Meniere's disease),* characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing.  With both A and B:
A.  Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
B.  Hearing loss established by audiometry.
20 C.F.R. Pt. 404, Subpt. P, App. 1.

fifth and final inquiry: whether the claimant has the residual functional capacity to perform other forms of substantial gainful activity, considering the claimant's age, education, work experience and impairments.  Id.

It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays, 907 F.2d at 1456.

The Fourth Circuit has held that the decision of an ALJ must explain its rationale when determining that a plaintiff's specific injury does not meet or equal a listed impairment.  See Cook, 783 F.2d at 1172.  "This requires an ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed impairments in more than a "summary way."  Id. At 1173.  The ALJ is required to give more than a mere conclusory analysis of the plaintiff's impairments pursuant to the regulatory listings.  Warner v. Barnhart, Civil Action No. 1:04-CV-8, p 7-9, 11 (Final Order of J. Stamp, filed March 29, 2005).[11]

The Undersigned agrees with claimant that the ALJ's failure to properly consider  Listing 2.07  when evaluating her claim is clear error.  The only statement appearing in the ALJ's written decision relating to Listing 2.07 is the following:  "The objective medical evidence does not show a very severe reduction in both ears."  (Tr. 21).  There is no further explanation in the ALJ's decision regarding Listing 2.07.  Not only does the ALJ improperly and summarily dismiss Listing 2.07 in his decision, he clearly misinterprets and inappropriately applies the language of Listing 2.07.

---

[11] See FN 6.

Listing 2.07 does not require "very severe reduction in both ears" as the ALJ's decision suggests. (Tr. 21). While hearing loss is required to satisfy Listing 2.07, it need not be bilateral. The plain language clearly indicates that hearing loss need only be established in one ear to meet the listing. Furthermore, this Court finds objective medical evidence in the record shows claimant suffers from hearing loss in her left ear. The ALJ himself found that the claimant had hearing loss as a severe impairment. (Tr. 18).

As for the other requirements of Listing 2.07, there are numerous documented reports in the record indicating claimant suffered from dizziness, vertigo, and disequilibrium, satisfying the requirement of balance disturbance. (Tr. 174, 181, 184, 222, 223, 225, 236, 239, 320, 324, 333). There is also medical evidence referencing tinnitus. (Tr. 180, 181, 184, 222, 223). Stephen Wetmore, M.D. saw claimant in 2001 and compared her hearing loss at that time to Dr. Daristotle's audiogram from 1999. He noted that her discrimination score was "44% on the left...[d]own from 66%..." (Tr. 181). Part A of Listing 2.07 requires disturbed function of vestibular labyrinth. Claimant was seen by Audiologist Valerie S. Graham at Ear, Nose and Throat Associates of Clarksburg on November 13, 2002. Ms. Graham indicated claimant had a "chronic or compensated vestibular pathology on the left side." (Tr. 232).

The ALJ did not adequately analyze Listing 2.07 and his explanation did not satisfy the Fourth Circuit requirements as laid out in Warner. For this reason, the Undersigned remands this case to the ALJ for further discussion and analysis of whether claimant's medical conditions meet Listing 2.07.

2.    Whether the ALJ Failed to Consider all of Claimant's Severe Impairments

Claimant argues the ALJ erred by failing to include a *current* labyrinthine-vestibular

dysfunction and Post Traumatic Stress Disorder ("PTSD") as severe impairments at Step two of the five-step sequential evaluation process. Commissioner contends that the ALJ correctly categorized claimant as having a *history* of acoustic neuroma. Commissioner argues that PTSD is a type of anxiety disorder and was properly evaluated and by the ALJ when he evaluated her depression and anxiety.

The Regulations state that "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Basic work activities are "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). The Regulations provide a number of examples. Id.

The ALJ found at Step two that the claimant had the following severe impairments: a history of acoustic neuroma requiring removal, and essential hearing loss in the left ear, decreased hearing acuity in the right ear, arthritis in the spine, obesity, and depression. (Tr. 18). The ALJ's findings will be upheld as long as they have substantial evidence to support them. Hayes, 907 F.2d at 1456. This Court agrees with the ALJ's assertion that the claimant has a history of acoustic neuroma. Characterizing claimant as having a history of acoustic neuroma, in and of itself, in no way ignores her present day condition as the claimant would have this Court believe. The objective medical evidence of record shows that the claimant underwent surgical removal of the neuroma in June 2001 (Tr. 196). The fact that the ALJ determined the claimant had a history of acoustic neuroma does not mean the ALJ overlooked the claimant's current hearing loss. However, the record indicates that the claimant suffers from vestibular dysfunction which caused dizziness, vertigo and disequilibrium. (Tr. 174, 181, 184, 222, 223, 225, 236, 239, 320, 324, 333). The ALJ erred by not finding in step two of his analysis that claimant suffered

from vestibular dysfunction which should have been characterized as a severe impairment.

The ALJ's failure to consider PTSD at step two of his analysis was also clear error. There is medical evidence in the record showing Claimant was diagnosed with PTSD on many occasions. (Tr. 251, 257, 322, 326, 358, 369). While it is true that the ALJ considered "depression with features of anxiety," it cannot reasonably be concluded that he was referring to PTSD with this statement. On remand, the ALJ should be instructed to consider vestibular dysfunction and PTSD as severe impairments at step two. This initial error is crucial to the decision because without first correctly considering claimant's severe impairments, the ALJ cannot properly consider the remaining steps of the sequential analysis.

3. Whether the ALJ Improperly Rejected All Medical Opinions Favorable to Claimant

Claimant alleges the ALJ improperly rejected all medical opinions favorable to claimant, specifically those of Dr. Mohamad Arja and Dr. Janicki. Commissioner argues the ALJ properly weighed and evaluated the medical opinions in the record in accordance with the Regulations at 20 C.F.R. § 404.1520.

It is the duty of the ALJ, not the courts, to make findings of fact, and the court will not substitute its judgment for that of the ALJ as long as substantial evidence exists. Hays, 907 F.2d at 1456. While the ALJ must consider a physician's report on the nature and severity of an applicant's impairments, the ultimate legal determination of a claimant's residual functional capacity rests with the Commissioner. 20 C.F.R. § 404.1527(d)(2); (e)(2); McLain, 715 F.2d at 869. Nevertheless, an ALJ is obligated to evaluate all medical opinions and may not choose to ignore the written opinion of a treating physician. Hines, 453 F.3d at 563. A treating

physician's opinion will be entitled to controlling weight in many circumstances. The opinion must be (1) well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.972(d)(2). A treating physician's opinion will be disregarded if persuasive contrary evidence exists. Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). To decide whether an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); 20 C.F.R. § 404.1508; Heckler v. Campbell, 461 U.S. at 461; Throckmorton, 932 F.2d at 297 n.1.

The ALJ specifically discounted the opinions of Dr. Arja and Dr. Janicki. Dr. Arja treated claimant between May 16, 2002 and December 3, 2002. (Tr. 236). On September 19, 2002, Dr. Arja diagnosed claimant with acoustic neuroma, gastroesophageal reflux disease, depression, generalized anxiety disorder, hip and back pain, hearing loss and vertigo. (Tr. 239). Dr. Arja was of the opinion that claimant was not able to function successfully in any work environment due to her hearing loss and difficulty handling stressful situations. (Id.).

The ALJ's decision completely overlooked Dr. Arja's treatment and diagnosis of claimant. Commissioner contends that Dr. Arja's treatment occurred one year prior to claimant's alleged onset date of disability and is therefore not relevant to her claim. However, the ALJ in this case decided to consider claimant's complete medical history consistent with 20 C.F.R. § 416.912(d).[12] The ALJ, by his own accord, had a duty to consider claimant's complete medical history which includes Dr. Arja's treatment and diagnosis. The fact that the ALJ summarily

_____

[12] 20 C.F.R. § 416.912(d) states in relevant part: Before we make a determination that you are not disabled, we will develop your *complete* medical history for *at least* 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary...(*emphasis added*).

43

disregarded Dr. Arja's opinion, an opinion requested by the state agency, is clear error and is cause for remand. Furthermore, if the ALJ believed Dr. Arja's opinion to be irrelevant, it should have been listed in his decision along with rationale as to why he believed so.

The record also includes the opinion of Dr. Janicki, a non-treating physician. (Tr. 356-357). Dr. Janicki's opinion was rendered as part of claimant's application for Medicaid. Dr. Janicki determined that claimant had a medically determinable impairment or combination of impairments which significantly limits [her] ability to perform basic work activity. Dr. Janicki found that the claimant's impairments meet or equal the listing of impairments. Dr. Janicki failed to state which listing he found the claimant to have met.

The ALJ considered this opinion and rejected it because it was not clear what evidence was relied upon or to which listing Dr. Janicki was referring. (Tr. 23). Claimant argues that the ALJ erred by never mentioning these questions at any time prior to his written decision. She further argues that the ALJ had a duty to recontact Dr. Janicki. Commissioner counters that the ALJ rightfully accorded little weight to Dr. Janicki's opinion and the opinion of disability is ultimately reserved to the Commissioner.

An ALJ may rely on the opinions of non-examining physicians, even when those opinions contradict the opinion of a treating physician, if the opinions are consistent with the record. Gordon, 725 F.2d at 235. Regardless of a physician's opinion, the ultimate legal determination of Claimant's impairments remains with the Commissioner. 20 C.F.R. § 404.1527(d)(2); (e)(2); McLain, 715 F.2d at 869. The ALJ's findings will be upheld as long as substantial evidence supports them. Hays, 907 F.2d at 1456.

"[T]he ALJ must decide what weight to assign to a non-treating physician's opinion, based on several listed factors (including (i) the existence, nature, and extent of any treatment or examining relationship; (ii) the extent to which the opinion is supported by medical evidence and is consistent with the record as a whole; and (iii) whether the opinion is rendered an area of specialty). Craft, 164 F.3d 624 (Table) (4th Cir. 1998).[13] "An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," Scivally, 966 F.2d at 1077, or has not given good reason for the weight afforded a particular opinion. Craft, 164 F.3d 624 (Table) (4th Cir. 1998). See also 20 C.F.R. § 404.1527(d).

The Court finds the ALJ's rejection of Dr. Janicki's opinion is not supported by substantial evidence. As explained above, the ALJ rejected Dr. Janicki's opinion because Dr. Janicki provided an opinion regarding claimant's disability, an issue reserved for the Commissioner. (Tr. 23). In addition, the ALJ dismissed Dr. Janicki's opinion because he did not specify the evidence upon which his opinion rests, or which listing was met. Rather than dismissing Dr. Janicki's opinion because he did not fully understand it, the ALJ had a duty to contact Dr. Janicki for further clarification in accordance with 20 C.F.R. § 404.1512(d)(2)(e).[14] Accordingly, the Court finds that the ALJ's rejection on both of these bases is not supported by substantial evidence and the case must be remanded for further consideration of Dr. Janicki's opinion despite the fact he provided an opinion on an issue reserved for the Commissioner.

---

[13] See FN 6.

[14] 20 C.F.R. § 404.1512(e) states: "When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision."

Specifically, the ALJ is instructed to contact Dr. Janicki in accordance with 20 C.F.R. §

404.1512(e).

      4.      <u>Whether the ALJ Failed to Include All of Claimant's Limitations in the RFC</u>

              <u>Finding</u>

Claimant alleges the ALJ erred by not including in her RFC limitations caused by her

frequent episodes of dizziness, vertigo and balance disturbance. Commissioner argues that the

ALJ properly determined claimant's RFC.

At step four of the sequential analysis, the ALJ must determine the claimant's RFC. 20

C.F.R § 404.1520. The RFC is what a claimant can still do despite her limitations. Id. at §

404.1545. More specifically, it is an assessment of a claimant's functional limitations resulting

from medically determinable impairments (or combination of impairments) and includes the

impact of related symptoms such as pain. SSR 96-8p (1996). The determination of a claimant's

RFC is based upon all of the relevant evidence. 20 C.F.R. § 404.1545. Observations by treating

physicians, psychologists, family, neighbors, friends, or other persons of Claimant's limitations

may be used. <u>Id.</u> These descriptions and observations must be considered along with medical

records to assist the Social Security Administration to decide to what extent an impairment keeps

a claimant from performing particular work activities. <u>Id.</u>

During step five of the sequential analysis, the ALJ is responsible for reasonably setting

forth all of Claimant's impairments in the hypothetical posed to the VE. <u>Walker</u>, 889 F.2d at 50

; SSR 96-5p (1996). In other words, the hypothetical must "adequately reflect[ed]" a persons's

impairments. <u>Johnson v. Barnhart</u>, 434 F.3d 650, 659 (4th Cir. 2005). However, the ALJ's

hypothetical need only include those limitations supported by the record. <u>Id.</u> The limitations

and impairments included in the hypothetical should reflect the Claimant's RFC.   20 C.F.R. §

404.1545, SSR 96-8p.

The ALJ in the present case determined Claimant had a RFC to "perform the exertional

demands of light work, or work which requires maximum lifting of twenty pounds and frequent

lifting ten pounds; some light jobs are performed while standing, and those performed in the

seated position often require the worker to operate hand or leg controls.  (20 C.F.R. § 404.1567

and 416.967).  In addition, the claimant has the following exertional and non-exertional

limitations: she must [be] able to briefly (one or two minutes) change positions after at least

every 30 minutes; she cannot work in areas of significant background noise; she must be able to

have new instructions given to her face-to-face; she cannot do any work that requires her to

climb ladders, ropes, scaffolds, stairs, or ramps; she can do no work that requires more than

occasional balancing; she can do no work that requires more than occasional balancing; she can

do no work that requires exposure to significant workplace hazards like heights, or dangerous

moving machinery; she can do no work that requires detailed or complex instructions; she can do

no work that requires close concentration or attention to detail for extended periods; she can do

no fast-paced or assembly-line work; she can do no work that requires contact with the general

public; she can do no work that requires close interaction with co-workers or supervisors; and

she must be able to miss up to one day of work per month."  (Tr. 22).

The ALJ then posed the following hypothetical to the VE: "If we assume a person of the

same age, education and work experience as the claimant.  But assume the person [is] able to do

light work as that's defined in the Commissioner's regulations.  But in addition, the person

would have to have the ability to change positions briefly and by briefly I mean just for a minute

or two, at least every half hour. Be no significant background noise and must be able to have instructions given face to face. And no ladders, ropes, scaffolds, stairs or ramps. And no more than occasional balancing. No exposure to significant work place hazards like heights or dangerous moving machinery. And there should be no work with detailed or complex instructions. No close concentration or attention to detail for expended [*sic*] periods. The job should not involve fast paced or assembly line work. No work with the general public. And no close interaction with the supervisors of [*sic*] the co-workers. (Tr. 406). The VE replied that such an individual would be able to work as a grader sorter, office assistant, machine operator or machine tender. (Tr. 406). The VE replied that the jobs would be unavailable if the individual had to miss more than two days of work per month. (Tr. 406). The VE also testified that confrontational type conflicts would not be tolerated in the workplace and if they occurred on an on-going basis would affect the person's employability. (Tr. 407).

This Court finds that Claimant's RFC and the hypothetical to the VE did not sufficiently account for Claimant's limitations arising from her episodes of dizziness, vertigo and balance disturbance, as well as her deficiencies in social functioning. As evidenced above, the RFC and hypothetical provide for Claimant missing one day of work per month. However, the record suggests Claimant may need to miss more than one day of work per month. Claimant suffers from dizziness and she testified she experiences balance problems and stumbles over herself when walking at times. (Tr. 393). She also testified that her mind races, she experiences anxiety and has been hospitalized because of a panic attack. (Tr. 402-403). Furthermore, the claimant testified that she has trouble concentrating, gets aggravated and moody (Tr. 384), gets nasty and snappy with people. (Tr. 387). Claimant's testimony is corroborated by objective medical

evidence. The ALJ failed to address potential conflicts with co-workers or supervisors. Accordingly, the case must be remanded for further consideration of Claimant's RFC in light of the above evidence.

    5.    <u>Whether the ALJ Properly Considered Claimant's Credibility</u>

Claimant lastly contends that the ALJ failed to properly evaluate Claimant's credibility because he supplanted his own opinions for the two-part test outlined in <u>Craig</u>, 76 F.3d at 585. Commissioner argues the ALJ properly evaluated Claimant's subjective complaints.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in <u>Craig</u>, 76 F.3d at 585. Under <u>Craig</u>, when a claimant alleges disability from subjective symptoms, she must first show the existence of a medically determinable impairment that could cause the symptoms alleged. <u>Id.</u> at 594. The ALJ must "expressly consider" whether a claimant has such an impairment. <u>Id.</u> at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about her symptoms, in determining whether the claimant is disabled. <u>Id.</u> at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. <u>Id.</u> If the ALJ does choose to discredit a claimant's statement, the ALJ must explain his reason for doing so. SSR 96-7p.

The Court finds the ALJ's discrediting of claimant's statements as to the subjective allegations of pain, limitations and overall disability is not supported by substantial evidence. The ALJ in the present case concluded, "the undersigned finds that the claimant is not entirely credible with regard to the nature and extent of her limitations and overall disability." (Tr. 23).

49

In coming to his conclusion, the ALJ relied on Claimant's lifestyle evidence and his conclusion that claimant "has required little in the way of treatment for her psychological impairments, including no apparent need for continual therapy sessions or hospitalizations or other in-patient care." (Tr. 23). The Court finds the ALJ's conclusion is not supported by substantial evidence because he failed to consider all of claimant's severe impairments at step two. The ALJ disregarded claimant's post traumatic stress disorder. PTSD provided the basis for the majority of her psychological problems. Accordingly, the Court finds the case must be remanded for further consideration of Claimant's credibility in light of the above findings and evidence.

6.    Whether the Additional Evidence Submitted to the Appeals Council Subsequent to the Hearing Warrants a Remand

In an action to review denial of social security disability benefits, a reviewing court may remand a case if the following three prerequisites are met: 1) the evidence must be new; 2) it must be material; and 3) there must be good cause for the failure to incorporate such evidence into the record at the prior proceeding. Hammond v. Apfel, 5 Fed. Appx. 101, 103 2001 WL 87460 (4th Cir. 2001).[15]

The Claimant was treated at the Appalachian Community Health Center from July 13, 2006 thru September 15, 2006. (Tr. 369). The hearing was held on May 10, 2006 (Tr. 377-409). Because claimant's treatment at the Appalachian Community Health Center began subsequent to the hearing in this case, the evidence is new and satisfies both the first and third prongs of the Hammond test. Good cause was shown because it would have been impossible to incorporate this evidence into the record at the prior proceeding.

_____

[15] See FN 6.

The evidence is material and therefore meets the second prong of the <u>Hammond</u> test. On July 13, 2006, psychiatrist Greenbrier Almond, M.D. diagnosed claimant with PTSD (Tr. 369). This is clearly relevant because Dr. Almond was among many doctors to have diagnosed claimant with PTSD. There is substantial evidence in the record indicating claimant suffers from PTSD. However, the ALJ failed to find that PTSD was a severe impairment. The Undersigned finds this to be erroneous and orders the ALJ to consider this new evidence on remand.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **GRANTED** for the following reasons: 1) The ALJ did not adequately analyze Listing 2.07 and his explanation did not satisfy the Fourth Circuit requirements as laid out in <u>Warner</u>; 2) The ALJ failed to consider all of Claimant's severe impairments; 3) The ALJ improperly rejected the medical opinions of Drs. Arja and Janicki; 4) The ALJ failed to include all of Claimant's limitations in the RFC finding; and 5) The ALJ improperly evaluated Claimant's credibility under <u>Craig</u>.

2.      Commissioner's Motion for Summary Judgment be **DENIED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of

this Court based upon such Report and Recommendation.

DATED: September 23, 2008

/s/ James E. Seibert

JAMES E. SEIBERT

UNITED STATES MAGISTRATE JUDGE
